IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
_____

**REECE HOWELL, III,**
**RICHARD HOWELL and**
**wife, MITZI S. HOWELL,**

Plaintiffs-Appellees,

Vs.

**C. WELDON HOWELL and**
**wife, LILLY L. HOWELL,**

Defendants-Appellants.

**FILED**

**July 27, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

Lincoln Circuit No. 219-94
C.A. No. 01A01-9806-CV-00301

_____

FROM THE LINCOLN COUNTY CIRCUIT COURT
THE HONORABLE LEE RUSSELL, JUDGE

John J. Archer of Nashville
For Appellees

Henry, Henry & Speer, P.C., of Pulaski
For Appellants

*REVERSED IN PART, AFFIRMED IN PART AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

**ALAN E. HIGHERS, JUDGE**

**HOLLY KIRBY LILLARD, JUDGE**

This appeal involves a dispute among landowners over two small parcels of property.

Defendants/appellants, C. Weldon and Lilly Howell (collectively hereinafter "Weldon"), appeal

the trial court's order partially granting judgment in favor of plaintiff/appellee, C. Reece Howell,

III (Reece).

The parties to this appeal are closely related as Reece and Weldon are nephew and uncle respectively. Reece owns approximately seventy (70) acres known as the North and South Patrick tracts (Patrick tracts) contiguous on the north and east with Weldon's land of approximately twenty (20) acres known as the UCL tract. A plat of the properties is attached as an addendum to this Opinion.

A brief history of the subject land is warranted. In 1936, C. R. Howell, Sr. (C.R., Sr.) purchased a tract of land of approximately twenty (20) acres from the Union Central Life Insurance Company. This property became known as the UCL tract. That same year C.R., Sr. sold the UCL tract but retained a strip of land approximately sixteen and one-half (16.5) feet wide and one thousand feet (1000) long that ran along the western border of the UCL tract. This strip of land became known as the Passway Parcel. C.R., Sr. also retained a small portion of land on the eastern boundary of the UCL tract which contained a spring and was known as the Springs Parcel or West Waterworks Parcel (Springs Parcel). In 1950, C.R., Sr. conveyed the Springs Parcel to Norman who subsequently conveyed it to Farrar.

C.R., Sr. died a widower in 1958. His will directed his executors, C.R. Howell, Jr. (C.R., Jr.) and Weldon, to sell all his real estate and distribute the proceeds equally among his nine children. At the time of his death, C.R., Sr. owned the Passway Parcel, yet his executors failed to sell it.

C.R., Jr., Reece's father, acquired title to the UCL tract and later sold it to his brother Don Stanley Howell (Stanley), Weldon's brother and Reece's uncle, in 1966. The deed transferring the UCL to Stanley specifically excluded both the Passway Parcel and the Springs Parcel.

C.R., Jr. died in 1988 leaving all of his real property including the Patrick tracts and the Passway Parcel to his wife, Reece's mother[1]. She in turn conveyed the Patrick tracts and the Passway Parcel to Reece by quitclaim deed in 1989.

In 1991, Stanley sold the UCL tract to his brother Weldon. The deed specifically excludes the Passway Parcel and the Springs Parcel. In 1996, Reece purchased the Springs

_____

[1]C.R., Jr. apparently believed he owned the Passway Parcel in fee simple at the time of his death.

2

Parcel from the record owner Mary Alice Farrar Shideler.

No one disputed the use of the Passway Parcel until 1994. At a birthday party for one of the older members of the family, Reece told Weldon that he planned to put a mobile home for his mother and grandmother on part of the Patrick tracts.[2] Reece also told Weldon that he wanted to use the Passway Parcel as it was the easiest means of ingress and egress from the proposed area. The parties disputed the ownership of the Passway Parcel and discussion took place over the use of the strip of land.

The parties did not reach an agreement; however, Reece placed the mobile home on his property and began the placement of a waterline across the Passway Parcel. In retaliation, Weldon locked a gate from the road into the Passway which denied Reece access to the Patrick tracts by way of the Passway.

Reece, along with his son and daughter-in-law, filed suit for damages and to enjoin Weldon from interfering with their means of ingress and egress along the Passway Parcel. At this point both parties apparently believed that each owned the Passway Parcel outright by express deed. However, after checking the chain of title, Reece learned that the Passway Parcel should have been sold by the executors of C.R., Sr. estate in 1958. The failure of the executors to sell the property made all nine children co-tenants in the property. The trial court ordered Reece to join all the other co-tenants in the suit, but before he could do so, the owners of the other seven-ninths conveyed their interests to Weldon. Also, Reece's son and daughter-in-law conveyed their interests in their lot back to Reece, and the litigation involved a dispute between Reece and Weldon and his wife.

Subsequently, Reece amended his complaint to include a claim that he and Weldon owned the Passway Parcel as tenants in common. However, Reece also claimed that the Passway Parcel was an apparent, visible, recognized and necessary means of access to the Patrick tracts and thus he had an easement by implication. Further, he claimed that for at least thirty (30) years owners of the Patrick tracts have made open, notorious and actual use of the Passway Parcel, and thus a prescriptive easement existed. Finally, Reece claimed that Weldon had denied him access to the Springs Parcel by erecting a fence. Reece requested the court to order Weldon

---

[2]Reece sold a small portion of the Patrick tracts to his son, Richard and his daughter-in-law. It was upon this small piece of land that the mobile home was placed.

to remove the locked gate denying access to the Passway Parcel, to grant him an easement across the Passway Parcel, and to enjoin Weldon from trespassing on the Springs Parcel.

Weldon answered Reece's complaint and filed a counterclaim which asserted ownership of the Passway Parcel by adverse possession, asked for damages in the amount of $25,000, and in the alternative, asked that if the easement is granted by the court that the easement be one for ingress and egress only and forbidding the placement of a water line. In Weldon's answer to the amended complaint, a claim was made for all property located within the fenced boundaries of the UCL tract including the Springs Parcel.

After a trial on the merits with testimony of numerous witnesses, the trial court issued an order which stated in pertinent part:

ORDER

This cause came to be heard on the 19th day of March, 1997 before the Honorable Lee Russell, Judge, 17th Judicial District (Part II), upon the Complaint and Amended Complaint filed by the Plaintiffs, the responses of the Defendants thereto, the counter-claim filed by the Defendants, the response of the Plaintiffs thereto, the opening statements by counsel of record, the testimony of witnesses for all parties in open court, the deposition testimony of various witnesses, and upon the entire record from all of which the Court finds as follows:

*       *       *

6. Each party now claims to own the Passway in its entirety by various theories of adverse possession or prescription. Each side claims that they have been damaged by the other side's use of the property since the dispute began. Plaintiff Reece Howell claims that the Defendants owe him money for land rental, unrelated to the boundary dispute, and the Defendants counter that they should be credited for expenditures for fence repair done. The Defendants claim that the Defendant wife's longhorn cattle had horns damaged due to their frightened reactions to the Plaintiff's traffic on the Passway. The Defendants complain that the Plaintiffs placed a waterline on the Passway, thereby damaging it. The Plaintiffs have amended their Complaint to seek resolution of an alleged dispute over an additional small parcel on the boundary between Reece Howell's property and that of Weldon Howell.

*       *       *

10. The Plaintiffs and the Defendants are relative newcomers to any claim of ownership to the Passway, taking their deeds in 1989 and 1991 respectively. However, there was abundant proof at trial about the use of the Passway during the ownership of the parties' predecessors in title. This trial court concludes that the Passway and the balance of the UCL property were not separated by any fence and that the owners of the UCL

4

property and their renters generally made use of the Passway for agricultural purposes. At times during the period since 1936 the UCL tract was row cropped and the crops were planted up to the fence on the west boundary of the Passway, so that the Passway was at times cropped by the owners or renters of the UCL tract. At other times, the owners or renters of the UCL tract ran livestock in the Passway.

11.    On the other hand, this trial court finds that periodically the Passway was used as a means of access for the owners or renters of the Patrick tracts to have access to that property from Prospect Road. At times the Passway was not cropped to the fences so that access was possible, and at times there appeared to be a crude road along the Passway. The predecessors in title of the parties here, and the renters from those predecessors in title, generally did not obtain the permission of the predecessors in title of the other parties to make use of the Passway. The various uses of the Passway apparently generated no friction, no adverse claims until the 1990's.

12.    The proof in the case will not support an abandonment of the Passway by C.R. Howell, Sr., or by those who inherited from him. The parties to this litigation and the other residuary beneficiaries of C.R. Howell, Sr., were therefore co-tenants of the Passway. As such the possession of the Passway would not be adverse to each other unless one party communicated to the others an intention to the co-tenancy of the other party, to attempt an ouster of the other co-tenants. . . . The evidence in the present case is devoid of any such expression of intention to claim an adverse interest or to accomplish an ouster, at least before Reece Howell's mother purported to convey the entire Passway. Everyone assumed ownership of the strip, incorrectly as it turns out, but no one attempted to exclude anyone else from exercise of joint ownership. No one challenged anyone else's use of the land until the 1990's.

*          *          *

14. The Plaintiffs claim an interest in or prerogatives for use across the Passway based on necessity or implication. The claim is made that the Passway is the only practical access that the Plaintiffs have to the "mesa" or western portion of their property. Although the western portion of the Plaintiff's property is in fact higher than the rest of the property and more easily accessed by the Passway, the proof at trial will not support the proposition that the Passway is the only practical access to the mesa. The evidence is overwhelming that other routes up to the mesa are available and have in fact been used and are practical even for light vehicle traffic.

15. As to the Passway, this trial court finds that neither side has suffered any damages as a result of the other co-tenants using the property in a manner inconsistent with the other parties' use of the property. The testimony on the injury to the longhorn cattle was, in addition, highly speculative. The rental agreement is found to have been for a period of nine and a half months, and credit is given to the Defendants for the expense of the fencing. As to the issue of the other parcel of property, the "West Waterworks" property, it is held that parcel as it appears on the

survey, Exhibit 2, belongs to the Plaintiffs. The proof in this case does not support a claim by the Defendants to that property by adverse possession or otherwise.

16. The final issue is how to deal with future use of the passway now that it has been adjudicated to belong one ninth to the Plaintiffs and eight ninths to the Defendants. Arguably the parties could be left as joint tenants until such time as a partition is sought, but their proposed prospective uses of the property appear to the court to be so inconsistent that continued co-tenancy would guarantee future conflict and litigation. The property could not practically be partitioned, the Plaintiffs have no practical use for less than all of the Passway and the threat to the Defendants' cattle being the same if the Plaintiffs have use of any portion of the Passway. The Passway will therefore be sold with one-ninth of the net proceeds going to the Plaintiffs and eight ninths to the Defendants. If parties cannot agree to a private sale, then the property will be sold by the clerk.

Weldon appeals the order of the trial court and requests this Court to determine the following issues presented in appellants' brief:

I. Whether the defendant Weldon Howell owns the Passway Parcel by adverse possession.

II. Whether the defendants own the Springs Parcel by adverse possession.

III. Whether the defendants' counter-claim for damages should have been sustained. . . .

Reece also presents the following issues in his brief:

1. Whether the plaintiff Reece Howell, III, owned an easement for ingress and egress over and across the passway parcel?

2. Whether the trial court erred in ordering a sale of the Passway Parcel, although none of the parties asked for a sale of the Passway Parcel or requested relief of that nature or type?

3. Whether the court erred in finding that the plaintiff Reece Howell, III, owned a one-ninth (1/9) interest in the Passway Parcel instead of a one-eight[h] (1/8) interest?

Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

We believe that a brief summarization of witness testimony is helpful in determining the preponderance in the present case.

**Danny Shelton**, a native of Lincoln county and a cattle farmer, worked for the Delap brothers when they

rented the UCL and Patrick tracts in the 1970's. He then rented the Patrick tracts himself from 1984 to 1992. He testified by deposition that beginning in the early 1970's until the late 1970's he used the Passway Parcel to access the Patrick tracts from Prospect Road at least once a week. He further claimed that the Passway Parcel appeared to be a field road, and he did not recall it ever being planted over.

**Jerry Delap**, nephew of C.R., Jr. and Weldon, testified by deposition that he and his brother rented both the UCL and Patrick tracts from Stanley Howell from the early 1970's until the late 1970's and continued to rent only the UCL until 1984. He claimed that the UCL tract was planted in cotton all the way to the western fence line and that the Passway Parcel was also planted over. He stated that he was unaware that a farm road even existed on the UCL until the late 1970's when he used the Passway Parcel a few times to access the Patrick tracts in order to remove hay.

**James V. Beyer**, a professional land surveyor, testified that he prepared a survey of the UCL and Patrick tracts for Reece. He also testified that in 1977 he used the Passway Parcel to access and survey the property to the west of the UCL and Patrick tracts. He stated that it appeared to be a farm road, and that during the few days he used the Passway he saw other people using it to access the Patrick tracts. As to the Springs Parcel, Beyer testified that he surveyed it prior to trial and observed an old fence that had grown into the trunk of several trees bisecting the parcel. He observed that part of the fence was rebuilt with newer wire and posts.

**Reece Howell, III**, the plaintiff in this action, testified that he was 56 years old and had lived near the disputed property for 40 years before moving. He testified that when he was younger he used the Passway Parcel as an access to the Patrick tracts for farming and hunting. He stated that for as long as he could remember a culvert had existed allowing access to the Passway Parcel from Prospect Road, and a gate had existed on the northern boundary of the Passway leading into the Patrick tracts. His earliest recollection of using the Passway Parcel was approximately age 10 to 12 or the mid 1940s.

Reece testified that he had always been told that his father owned the Passway Parcel, and that he believed his mother had the power to transfer title to the Passway following his father's death. At a birthday party for one of the older family members, Reece approached Weldon and told him that he planned to place a home on a part of the Patrick tracts that he had sold to his son Richard, and that he wanted to run a waterline along the Passway Parcel. Weldon objected and locked the gate allowing access from Prospect Road to the Passway. Reece then spent $1,977.00 fixing another access road to the Patrick tracts to make it passable. Reece knew that Danny Shelton, the Delap brothers and land surveyors, John White and Beyer had used the Passway Parcel at different times. He denied telling Weldon that he wanted to purchase a 16.5 foot strip of land on the west side of the UCL during a conversation in 1994.

As to the Springs Parcel, Reece testified in pertinent part that a hydraulic ram was located there that supplied

7

water to the Patrick tracts. He stated that his father, C.R., Jr., maintained the hydraulic ram for many years before he died. The Springs Parcel was used to water cattle by people on both the UCL and Patrick tracts and he never noticed a permanent fence in place.

**Jeanette Howell** testified that the access road leading to the section of the Patrick tract was difficult to travel.

**Gordon Shelton**, age 78, testified that he had lived in Lincoln County near the property in question all his life. He had bushhogged the Patrick tracts for C.R., Jr. for 14 or 15 years beginning in 1982 and when bushhogging would use the Passway Parcel. He even bushhogged the Passway Parcel approximately 1 to 3 times per year at C.R., Jr.'s request. He knew that Danny Shelton used the Passway Parcel to access the Patrick tracts when tending to cattle.

**Richard Howell**, son of Reece, testified that he was an original plaintiff to this case in that he purchased a parcel of land located on the Patrick tracts from his father but later resold the parcel to Reece. The parcel he purchased from Reece was originally to be the location of a house for his mother and grandmother, and the discussion of this sale and the subsequent plans precipitated the confrontation in this case. He has used the Passway Parcel to access the Patrick tracts from the time he was 7 years old until the present (he is now 27).

**Randy Delap**, nephew to Stanley and Weldon, testified that he rented and worked cotton in the UCL tract and cattle in the Patrick tracts during the 1970's. He initially accessed the Patrick tracts from a dirt road on the east side of the property. However, in the mid-1970's he began to use the Passway Parcel to bring hay bales from the Patrick tracts. He did not remember anyone else using the Passway. He stated that he and his brother farmed the UCL tract from fence row to fence row and over the Passway, and there was no evidence of a road before they began to exit the Patrick tracts when they removed hay.

**Thomas Simmons**, a lifelong resident of Lincoln County, testified that he rented part of the Patrick tracts for approximately 10 years beginning in 1978. He accessed the property by a farm road off Liberty Road from the east. This farm road provided good access to the Patrick tracts, and he did not have any problems getting around the property. In the early 1980s, he began to use the gate at the northwest corner of the UCL tract to access the Passway Parcel about 4 or 5 times a year.

As to the Springs Parcel, Simmons testified that there was an old fence that divided the parcel, but that it was down in a few places and the cattle could freely move from the Patrick tracts to the spring.

**William Simms** testified that he delivered hay to Weldon along the western boundary of the UCL tract approximately 5 times in 1995 and at that time there was no visible evidence of a farm road.

**Don Stanley Howell**, brother of Weldon and uncle of Reece, testified that he owned the UCL tract from

8

1966 to 1991 when he sold the property to Weldon. He had examined the property recently, and the fences that are there now are in the same location that they were when he was a child in the 1930s and 40s. When he purchased the property in 1966, he understood that he had purchased the land from "fence to fence" and that is what he thought he sold to Weldon. He did not think that any right of ways existed through the UCL. He gave permission to C.R., Jr. to use the Passway Parcel. He did not remember a gate at the boundary of the Passway Parcel and the Patrick tracts during his youth. While he owned the UCL tract, crops such as cotton, soy, and corn were sowed and grown on the entire tract from fence to fence and the Passway Parcel was planted over.

As to the Springs Parcel, he testified that he had recently examined the fence splitting the Springs Parcel, and it was in the same location as when he was a child. He described the fence as old and that it had grown into the trees that grew along it.

On cross examination, Stanley testified that was in the military from 1950 to 1970 and then retired to Tampa, Florida until 1985. He did not observe the UCL on a frequent basis and rented the land to others. In 1993, he moved back to Howell Hill after selling the UCL to Weldon.

**Weldon Howell**, Defendant/Appellant, testified that he was born in 1921 and had lived his entire life in the general area around the contested land. He stated the fences on the UCL are in the same position as they were when he was a child. He described the fence through the Springs Parcel as very old and in the same position as he remembered from the age of 15 or 16.

He testified that the only person to ask his permission to use the Passway Parcel was his nephew, Lanny Howell, who used it to access someone else's property when deer hunting. He claimed that Reece offered to buy a strip of land across the UCL so that he could access the Patrick tracts from Prospect Road. He refused to sell but later he found that Reece had dug a trench for a water line.

As to Reece's request for damages for failure to pay rent on the Patrick tracts, Weldon testified that he repaired the fence bordering the parties' property after an ice storm and credited his costs to the rent owed Reece. He hired two men that worked for three days clearing fallen trees and limbs from the fence. Weldon said that his expenses amount to $746.00 which he deducted from the rent he owed. The expenses included paying the hands, use of chainsaws, new wire for the fence, and new fence posts.

**Gary Francis Howell**, nephew of Weldon, testified that he has lived all 51 of his years around the land in question. He said there was never any evidence of a farm road on the UCL, and he never noticed anyone traversing the western boundary of the UCL where the Passway was located. He stated that he had heard of an old deed that called for a means of ingress and egress to the Patrick tracts but was not sure where it was supposed to be located. As to the

Springs Parcel, he testified that the fence bisecting this tract was in the same location that he remember as a child.

**Arden Smith Humphrey**, niece of Weldon, testified that she grew up in the area adjacent to the tracts in question and never saw any evidence of a farm road on the western boundary of the UCL. She stated that she had overheard a conversation between Weldon and Reece, where Reece wanted to purchase a tract of the UCL. As to the Springs Parcel, she had not seen the tract in approximately 25 years but remembered a fence running through the center of the tract which she indicated on the diagram of the properties.

**Maude Smith**, sister of Weldon, testified that she lived adjacent and between the two tracts in question since 1961. She noticed only a few people using the Passway Parcel, and it did not look like a roadway. The ones using the Passway were mostly those that brought farm equipment in or out. Further, the UCL was planted from fence to fence, but she was not sure whether the Passway was planted over or not.

As to the Springs Parcel, she testified that she had seen the fence bisecting the parcel recently, and that it was in the same place that she had always remembered. As to the damage to the long horn cattle, she testified that the cattle would run away when the cars would use the Passway.

**Lanny Howell**, nephew of Weldon, testified that in 1994 he used the Passway Parcel as a means to access someone else's property, but that he first asked Weldon's permission. At the time there was not a visible road on the UCL, and he did not know of anyone else accessing the Patrick tracts through the UCL. As to the Springs Parcel, he testified that he helped C.R., Jr. work on the "ram" in the 1970s, and the fence is still located in the same place.

**Lilly Logan Howell**, wife of Weldon, testified that Reece commented to her that he wanted to buy a strip of land on the western boundary of the UCL. As to the damages, she stated that she raised 12 head of Texas long horn cattle on the UCL for show which were spooked by the laying of the waterline and the increased traffic on the Passway Parcel. Three of the cows had broken horns during this time. One cow was worth at least $4000 before the broken horn but only $200 after; another was worth $2200 but only $150 after the broken horn; and finally one was worth $4000 but worth nothing after the broken horn. Also, the cows also lost weight, and they were forced to purchase more grain and hay for 6 months at a cost of $3000.

On cross examination, Lilly testified that she did not see any of the cows damage their horns and does not know how the injuries occurred.

In his first issue Weldon contends that he has obtained sole legal title to the Passway Parcel by adverse possession. The trial court ruled, and we agree, that when C.R., Sr. died in 1958, and the Passway Parcel was not sold as required by his will, all of C.R., Sr.'s children became owners as tenants in common. Ordinarily, a tenant in common is presumed to hold on behalf of himself and all other co-tenants, and therefore the possession of one tenant in common

10

is not ordinarily held to be hostile to the co-tenants. *Moor v. Cole*, 200 Tenn. 43, 289 S.W.2d 695 (1956).

This Court stated the general rule as to adverse possession by co-tenants in *Valley v. Lambuth*, 1 Tenn. App. 547, 566 (1925):

> The rule seems to be that the holding of a co-tenant, openly, notoriously, exclusively, and exercising all rights of ownership, by cultivating the land, collecting the rents, enclosing the land, making improvements, selling timber, paying the taxes, for a long number of years, at least covering the period required by statute of seven years, or by prescription of twenty years, with the full knowledge of the co-tenants, and no settlements made or requested for rents and profits, the co-tenants not being under any legal disability, and with full notice and knowledge upon the part of the co-tenants of such adverse holding and claim by the tenant in possession, would constitute an actual ouster.

Weldon argues that he and his predecessor's in title held the Passway Parcel openly and exclusively against all the other tenants in common and have therefore ousted Reece. We believe, however, that the case of *Denton v. Denton*, 627 S.W.2d 124 (Tenn. App. 1981) is on point and controlling as to this issue.[3] In the aforementioned case, Mr. O.D. Denton died intestate in 1944 survived by 14 children and a widow and leaving a 53 acre farm. In 1960, Arthur Denton, one of O.D.'s sons, purchased the farm at a tax sale and lived and worked there until 1979 when other heirs of O.D. filed suit alleging they were co-tenants to the farm.

The trial court ruled that Arthur had purchased the farm at the tax sale for the benefit of the co-tenants but held that he had ousted the co-tenants and become the sole owner of the property by adverse possession. On appeal, the Court began by stating that adverse possession by a co-tenant was possible, but that this case deals specifically with "the single issue of what are the rights of the respective parties where one co-tenant holds possession and both he and the other co-tenants are ignorant of the existence of the co-tenancy." *Denton*, 627 S.W.2d at 127.

---

[3] Weldon's brief discusses and attempts to differentiate the *Denton* case by stating:

> The Denton Court acknowledges the rule as stated in Am. Jur. 2nd, p. 260 Adverse Possession, Section 173:
>
> "Although there is considerable confusion in the cases as whether there can be adverse possession by a co-tenant where he or his co-tenant or both are ignorant of the co-tenancy, on principle it would seem that one who holds sole possession of premises as the exclusive owner has a possession which is adverse to the whole world, including his co-tenant out of possession whether either or both were ignorant of the co-tenancy; and accordingly in a number of cases possession has been deemed adverse although both parties are unaware of the co-tenancy". [sic] (Cases and citation thereunder omitted).

However, Weldon failed to include the very next line from the *Denton* case which states: **"This, however, is not the rule in this jurisdiction."** *Denton*, 627 S.W.2d at 127. Appellants' assertion in the brief is misleading, to say the least. Counsel should carefully scrutinize court filings to avoid such an occurrence.

The *Denton* Court held that where all co-tenants are ignorant of the co-tenancy none can be ousted, and the property cannot be adversely possessed. The *Denton* Court stated in pertinent part:

> The leading case in this jurisdiction on this issue is *Hydas v. Johnson*, 28 Tenn. App. 126, 187 S.W.2d 534 (1944). In that case J. D. Hensley and wife, Mary, purchased a piece of property in 1917. Under the law as it existed at that time, each acquired a one-half undivided interest in the property. J. D. Hensley died intestate in 1921 survived by his wife and children. The widow and Willie Hensley continued to occupy the property until the death of Mary Hensley in 1929. Mary Hensley left a will willing the property to Willie Hensley. At that point Willie owned one-half of the property by virtue of his mother's will and in the other half he owned an equal share with the other children. Willie continued to live on the property, farming it part time and renting it out part time. All of the parties were of the opinion that the deed of 1917 created an estate by the entireties and Mary's will gave Willie title to the entire property. In a suit for partition the chancellor held that Willie's holding of the property was not adverse to the other heirs. The court of appeals, in sustaining the chancellor, said at 535:
>
>> "In this case, as in *Drewery v. Nelms* (132 Tenn. 254, 177 S.W. 946) the defendant merely occupied the property, appropriating the rents, and sold a small amount of timber valued at $12 without any question arising as to his ownership. Does the circumstance that the parties mistakenly thought he owned the entire property by virtue of the will of his mother afford a distinction between that case and this? We think not. There was no notice to complainants of a hostile possession by defendant to arouse them to active investigation and assertion of their rights and it is this which the law requires before the cotenant's presumptively friendly possession can be converted into one of a hostile character. Defendant has not shown that he has been injured by complainants' failure to assert their rights. On the contrary, he has had the full use of the property and, under the Chancellor's decree, he has been exonerated of any liability to account for rents and profits during his occupancy. Under the circumstances, we do not see that there has been any conscious acquiescence on the part of complainants and are of opinion the Chancellor was correct in not dismissing the bill because of laches based wholly upon the lapse of time."

*Denton*, 627 S.W.2d at 127, 128.

The issue presented and decided by the *Denton* Court is precisely the issue in the case before this Court whether parties ignorant of the fact that they are co-tenants may oust one another and adversely possess property. The *Denton* court found that they may not, and we agree.

Further evidence was presented at trial that Reece and his predecessors in title were never ousted from the Passway Parcel, and in fact, used the strip as ingress and egress from the Patrick tracts. The testimony at trial does not preponderate against the trial court's holding, and we agree that under the facts there was no ouster by Weldon of his co-tenants, and, therefore, Weldon did not hold the Passway Parcel adversely to them. *Moore v. Cole*, 200 Tenn. 43, 289 S.W.2d 695 (1956); *Hallmark v. Tidwell*, 849 S.W.2d 787 (Tenn. App. 1992).

We now turn to Weldon's second contention that he and his predecessors in title have adversely possessed a portion of the Springs Parcel. As stated earlier, the Springs Parcel is a small tract of land located partially within the fenced boundary of the UCL tract and partially within the Patrick tracts. It was specifically excluded from the deed to the UCL tract in 1936 along with the Passway Parcel. However, the Springs Parcel was sold by C.R., Sr. in 1950 to third persons. Reece obtained the Springs Parcel from the third persons and recorded the deed in 1996. Reece is not a tenant in common with Weldon in this tract.

Weldon claims that the small portion of approximately seven-tenths (.7) of an acre located within the fenced boundary of the UCL has been used continuously and openly by owners of the UCL for over twenty (20) years. The testimony at trial supports this contention. We note that although this issue was not presented in either Weldon's answer or counterclaim, it was tried and determined at the trial level without objection by Reece, and the pleadings are considered amended accordingly.

"To establish title by adverse possession, there must be an occupation of the property under a claim of right or title which is open, actual, continuous, exclusive, adverse and notorious for the prescriptive period of 20 years." *Catlett v. Whaley*, 731 S.W.2d 544, 546 (Tenn. App. 1987). See also *Coal & Iron Co. v. Coppinger*, 95 Tenn. (Pickle 11) 526, 529-30 (1895); *Tidwell v. Van Deventer*, 686 S.W.2d 899 (Tenn. App. 1984).

Several witnesses testified that the fence bisecting the Springs Parcel had grown into the trees bordering it. Others testified that the fence was in the same location that it had been in since the 1930s and 40s. The evidence established that Weldon has been in open, public, hostile and adverse possession of the land in question for more than 20 years without challenge by the legal owners and acquired title by adverse possession to the fenced-in area of the Springs Parcel. The evidence presented at trial preponderates against the trial court's finding on this issue, and Weldon has acquired a fee simple absolute title to the land so occupied.

Weldon next contends that his counterclaim for damages to the cattle should have been granted. We must first note that Weldon did not request damages to the cattle in his counter claim; however, the issue was tried by the lower court, Reece raised no objection, and thus the issue is deemed tried by consent.

The trial court found that the proof presented was too speculative to award damages. We agree. Lilly Howell testified as to the damages that the cattle suffered, but she did not see the injuries occur and could only speculate that traffic across the Passway Parcel was the cause. There seems to be ample evidence to support the trial court's finding on this issue.

We now turn to Reece's first issue asserting that he holds an easement by implication for egress and ingress over the Passway Parcel. The trial court ruled that no easement existed, and the evidence supports this holding. Reece

13

and Weldon hold the tract as tenants in common. In a co-tenancy, the possession of one is the possession of all, and the possession, as well of each part as of the whole, is in each tenant. *Cunningham v. Roberson's Lessee*, 31 Tenn. (1 Swann) 138 (1851); *King v. Rowan*, 57 Tenn. (10 Heisk.) 675 (1873). "Each has the same right to the possession, and the title of each extends to the whole." 8 Tenn. Jur. *Cotenancy* § 6 (1992). Any tenant in common has the right to enter upon the common estate and take possession of the whole thereof subject only to the equal right of other co-tenant, whose possession may not be interfered with. *Garland v. Holston Oil Co.*, 53 Tenn. App. 703, 386 S.W.2d 914 (1964).

As a co-tenant, Reece has the right to use the land as he wishes as long as his use does not interfere with Weldon's use, and thus he has no need for an easement of any kind. Weldon argues that the trial court should have ordered the waterline placed by Reece on the Passway Parcel removed. Reece, as co-tenant, has the right to use the tract, and there has been no showing that such use interferes with Weldon's use of the Passway Parcel.

Reece next raises the issue whether the trial court exceeded its power in ordering the sale of the Passway Parcel. However, Reece does not discuss this issue in his brief. Thus, we deem this issue waived and will not consider it. *State ex rel Dept. of Transp. v. Harvey,* 680 S.W.2d 792, 795 (Tenn. App. 1984).

Reece's final issue asserts that he owns a one-eighth (1/8) interest in the Passway Parcel instead of the one-ninth (1/9) interest found by the trial court. It appears that the parties to this suit as well as the trial judge failed to realize that only eight of the original nine children of C.R., Sr. were still living at the time of trial. In 1971, Lon Howell, son of C.R., Sr., died intestate and survived only by his wife. The record is unclear as to the percentage of ownership. Therefore, this issue is to be returned to the trial court in order to hold a hearing on this matter and determine the correct ownership percentages in light of the new information.

The judgment of the trial court that title to the Springs Parcel is vested in appellees is reversed, and title to said parcel west of the existing fence is vested in appellants. The case is remanded to the trial court for such other proceedings as are necessary including a determination of the correct percentage of ownership of the Passway Parcel. The judgment is affirmed in all other respects. Costs of the appeal are assessed one half to appellant and one half to appellee.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____

**HOLLY KIRBY LILLARD, JUDGE**